1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DALYNNE SINGLETON et al,

              Plaintiff,

       v.

CLARK COUNTY et al,

              Defendant.

Case No. 3:24-cv-05392-TMC

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS

## I.   INTRODUCTION

Twenty-eight-year-old Shelly Monahan died in July 2021 while incarcerated as a pretrial detainee in the Clark County Jail. During her seven-month incarceration, Ms. Monahan exhibited signs of mental and physical deterioration, and by the end had lost approximately 50 pounds. In the early morning of July 10, 2021, correctional officers observed Ms. Monahan lying on the floor of her cell in an odd position. They entered her cell and found Ms. Monahan having a seizure and unresponsive. Emergency Medical Services were called in and they attempted to resuscitate her but were unsuccessful. An autopsy performed by the Clark County Medical Examiner concluded that Ms. Monahan had died of severe hyponatremia and hypochloremia due to water intoxication.

Dalynne Singleton, Administrator of the Estate of Shelly Ann Monahan, on behalf of Ms. Monahan's four minor children, along with Ms. Monahan's husband and parents,[1] sued Clark County, individual Clark County employees, NaphCare, Inc., and individual NaphCare employees. Plaintiffs claim that Defendants knew or should have known that Ms. Monahan was at risk of self-harming behavior based on her history of psychiatric illnesses—prodromal psychotic disorder, schizophreniform, schizoaffective disorder, depressed type, and major depressive disorder with psychotic features—contained in Defendants' records from her previous bookings in the Clark County Jail. Plaintiffs assert that Defendants' failure to provide adequate medical care constituted deliberate indifference in violation of her Fourteenth Amendment right to medical care and negligence in violation of Washington state law.

NaphCare, Inc. is an Alabama corporation contracted by the Clark County Jail to provide medical care, mental health care, and other services to individuals incarcerated in the facility. Defendants NaphCare, Inc., NaphCare employees Alyssa Clarke, Lexie Hunter, Rose Mainah, Juli Pfau, Kaylea Tripp, Amanda Biver, Alexandria Sliss, Shannon Paris, James Eastman, Chanelle Hackney, and Daniel Gorecki, and NaphCare John Does 1–10 move to dismiss Plaintiffs' entire complaint for failure to join an indispensable party. *See* Fed. R. Civ. P. 12(b)(7). Defendants also move to dismiss Plaintiffs' constitutional claims for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). For the following reasons, the Court GRANTS the motion in part and DENIES it in part.

---

[1] While this motion was pending, Ms. Monahan's father, Plaintiff Keith Monahan, passed away. Dkt. 37 at 8. The surviving Plaintiffs do not oppose dismissal of their claims for deprivation of familial relationship. *Id.* But they suggest that Mr. Monahan's claim be dismissed without prejudice and with leave to amend so that his claim may be pursued by his Estate when a personal representative is appointed. *Id.* The Court agrees and grants Defendant's motion to dismiss Keith Monahan's claim for deprivation of a familial relationship without prejudice. The familial relationship claims by the other plaintiffs are dismissed with prejudice.

## II.   BACKGROUND

**A.   Factual Background**

Ms. Monahan was booked and processed for a felony criminal offense in the Clark County Jail on or around December 3, 2020. Dkt. 29 ¶ 6.1. She was incarcerated in the Clark County Jail until her death on July 10, 2021. *Id.* ¶ 6.48. The following discussion of the events leading up to Ms. Monahan's death is based on Plaintiffs' amended complaint, taking the factual allegations as true and construing them in the light most favorable to Plaintiffs as required on a 12(b)(6) motion. *See Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).

*1.   Ms. Monahan's mental health history*

Ms. Monahan had previously been booked and incarcerated in the Clark County Jail several times. *Id.* Plaintiffs allege that during those periods of incarceration, Ms. Monahan's mental health history was well-documented. *Id.* ¶ 6.1–6.2. Ms. Monahan had a longstanding diagnosis of schizophrenia dating back to 2014 in addition to borderline personality disorder and paranoia dating back to 2018. *Id.* ¶ 6.2. Ms. Monahan exhibited signs of "hearing voices, non-command in nature, going back to June 5, 2015 and continuing to the present incarceration." *Id.* In 2015, the Washington Department of Corrections conducted a psychiatric assessment and diagnosed Ms. Monahan with suffering from prodromal psychotic disorder, schizophreniform, schizoaffective disorder, depressed type, and major depressive disorder with psychotic features. *Id.* ¶ 6.1.

Ms. Monahan also suffered from PTSD, which was included in her medical history compiled by Clark County Jail and/or NaphCare. *Id.* ¶ 6.6. Plaintiffs allege that Ms. Monahan's PTSD was caused in part by a baby she lost in 2013 and Defendants knew or should have known of her history of PTSD. *Id.*

Plaintiffs further allege that while incarcerated, Ms. Monahan had threatened to and/or attempted suicide several times. *Id.* ¶ 6.3. On April 26, 2014, she was observed hitting her head on the wall and punching the wall several times. *Id.* ¶ 6.4. After being provided an ice pack, she reportedly opened the pack and drank from it. *Id.* Ms. Monahan was then taken to the hospital where she was admitted to the ICU for treatment. *Id.* Once she was released and taken back to the jail on May 6, 2014, she was placed on suicide watch. *Id.* In December 2015, Ms. Monahan was again considered at risk for suicide and admitted to the Close Observation Area by the mental health officer on duty for having suicidal and self-harming thoughts. *Id.* During this period, Ms. Monahan was continuously observed and provided modified furnishings, clothing, and eating utensils. *Id.*

Ms. Monahan also had a history of drug use, including the use of heroin and methamphetamine since 2013. *Id.* ¶ 6.5. She admitted attempting to commit suicide when she was 14 and 19 years old by taking sleeping pills. *Id.* During her last admission to the Clark County Jail in March 2020, NaphCare staff had to "detox" Ms. Monahan after she was found to be under the influence of drugs including opiates and methamphetamine. *Id.* Plaintiffs assert that Defendants knew or should have known that Ms. Monahan's past use of drugs also involved past attempts and threats of committing suicide. *Id.*

2.     *Ms. Monahan's mental and physical conditions decline during her incarceration at the Clark County Jail.*

When Ms. Monahan was first admitted to the Clark County Jail on or around December 3, 2021, she was placed in the general population after receiving a medical evaluation by NaphCare employees. *Id.* ¶ 6.7. Twenty-two days after being admitted, Licensed Practical Nurse (LPN) Rose Mainah wrote in a segregation note "that Ms. Monahan appeared disheveled, her room was a mess, and that she was mute/uncooperative." *Id.* ¶ 6.8. Though Ms. Monahan was

seen during morning medical rounds, LPN Mainah noted that she did not respond when called. *Id.* On December 28, 2020, Advanced Registered Nurse Practitioner (ARNP) Shannon Paris conducted a psychiatric evaluation of Ms. Monahan, noting that she had a history of schizophrenia and Generalized Anxiety Disorder. *Id.* ¶ 6.9. When Ms. Monahan was asked if she hears voices, she responded that "I see angels" and "I see demons too." *Id.* ARNP Paris added that Ms. Monahan appeared distracted, mostly answering in one-word answers. *Id.* While Ms. Monahan denied having suicidal thoughts, she endorsed having auditory and visual hallucinations. *Id.* ARNP Paris prescribed Ms. Monahan with Seroquel, 50 mg twice daily, increasing the dosage for the next few days. *Id.* Plaintiffs allege that even though Ms. Monahan had communicated that Seroquel was her regular medication and asked for it repeatedly upon incarceration, NaphCare employees did not prescribe it to her until December 28, 2020. *Id.*

On December 31, 2020, LPN Mainah offered Ms. Monahan the prescribed Seroquel medication but she refused it. *Id.* ¶ 6.10. No action was taken by LPN Mainah or Deputy Darling, who had also witnessed the refusal. *Id.* On January 25, 2021, LPN Julia Pfau noted that Ms. Monahan "refused to come to medical tonight to provide a urine sample. Patient also refused meds during evening pass [and] observed to be tearful under [her] blanket in [the] cell. Patient would not talk or elaborate to this nurse or deputy . . ." *Id.* ¶ 6.11. Two days later, LPN Pfau noted that Ms. Monahan refused the Seroquel and would not sign the acknowledgment of medication refusal. *Id.* Plaintiffs allege that from this point, the records are filled with Ms. Monahan's repeated refusals to take her medications dated on January 29, 2021, February 1, 2021, February 2, 2021, February 6, 2021, February 7, 2021, February 8, 2021, and February 9, 2021. *Id.* Plaintiffs allege that this documentation is part of a practice of "sham" refusals— treating detainees who lack the mental capacity to engage meaningfully with medical personnel

as "refusing" care. *Id.* ¶ 1.2. Despite the repeated refusals, Plaintiffs assert that Defendants took no action to address Ms. Monahan's worsening psychiatric condition. *Id.* ¶ 6.11.

By February 2021, Ms. Monahan's mental condition had further deteriorated, and Plaintiffs assert that Defendants "failed to take any prompt or appropriate care to attend to Ms. Monahan." *Id.* ¶ 6.12. Ms. Monahan was placed in segregated housing and on February 7, 2021, Deputy Ray Bettger observed Ms. Monahan flooding her cell by "scooping up bloody water from the toilet and pouring it on herself and onto the floor." *Id.* ¶ 6.13. She was menstruating into the toilet and using a tumbler to pour the bloody water over her head and into the cell. *Id.* Deputy Bettger issued her an infraction though he recommended leniency because her "mental state was well off baseline and she appeared to not be aware of her actions or consequences of those actions." *Id.* ¶ 6.13. LPN Kaylea Tripp noted, "[Ms. Monahan] is clearly not in her right mind," and placed her on a mental health list to be seen as soon as possible, though NaphCare records are unclear whether Ms. Monahan was seen urgently. *Id.* ¶ 6.12. Registered Nurse (RN) Amanda Biver, who also recorded this event, noted that the same night, Ms. Monahan flooded her cell a second time. *Id.* Ms. Monahan's body temperature was low, and she was too cold and shivery to obtain vitals. *Id.*

On February 8, 2021, Ms. Monahan had a low body temperature of 97.2 degrees and the next day, she had an abnormally elevated heart rate of 113 beats per minute. *Id.* ¶ 6.14. LPN Alexandria Sliss recorded that Ms. Monahan had abnormal vitals and was dehydrated. *Id.* ARNP Paris also reported that Ms. Monahan's appearance was "avoidant, resistant, with flat affect," and she continued to refuse to take her medications. *Id.* Shortly after, Ms. Monahan was placed on suicide watch because she had expressed suicidal ideations. *Id.* ARNP Paris noted Ms. Monahan should not be released from suicide watch until she was free of suicidal intent and that suicide precautions were to be taken, which included monitoring her every 15 minutes. *Id.*

NaphCare records dated February 14, 2021 show that another employee noted that Ms. Monahan had expressed suicidal ideation and was placed on suicide watch with cell checks every 15 minutes. *Id.* ¶ 6.15. The employee, however, cleared Ms. Monahan from suicide watch the next day. *Id.*

Ms. Monahan was referred for a psychiatric evaluation on March 12, 2021, but it was recorded that she "refused." *Id.* ¶ 6.16. Plaintiffs allege that on March 16, 2021, Ms. Monahan was placed into five-point restraints while screaming that she was suffering from kidney pain. *Id.* ¶ 6.17.

ARNP Paris placed an order for Ms. Monahan to take 200 mg of Seroquel nightly for the month of April, but she reportedly refused to take the medication. *Id.* ¶ 6.18. In a psychiatric progress note dated April 13, 2021, ARNP Paris wrote that while Ms. Monahan was not expressing suicidal thoughts, she had only been taking Seroquel intermittently. *Id.* ¶ 6.19. ARNP Paris also recorded that Ms. Monahan had lost 29 pounds since arriving at the Clark County Jail, and the next day, ARNP Paris noted that Ms. Monahan was "floridly psychotic." *Id.*

On May 11, 2021, Deputy Keith Jones reported that Ms. Monahan had received an infraction for throwing her food tray out of the food port and into the dayroom, causing a mess. *Id.* ¶ 6.21. Later that month, LPN Sliss noted that Ms. Monahan would not be seen on video camera and so staff could not see if she was consuming any food. *Id.* ¶ 6.22.

Pursuant to an order from Clark County Superior Court, Angela Sailey, a licensed psychologist and forensic evaluator, attempted to perform a competency evaluation on May 31, 2021. *Id.* ¶ 6.23. Ms. Monahan refused to participate in the evaluation, remaining mute and pulling her blanket over her legs and torso. *Id.* Dr. Sailey determined that Ms. Monahan did not demonstrate the ability to assist in her own defense and found that Ms. Monahan exhibited:

1
2
3
4
5

*erratic, unpredictable, and bizarre behaviors*, which have resulted in inconsistent engagement with medical and mental health providers, and at times refusals to attend medical appointments and a refusal to participate in the forensic interview. She has also demonstrated a *poverty of speech*, which resulted in a lack of verbal responses or yes/no responses when others attempt to engage her. There is also some indication of potential *delusional ideation* and *visual and auditory hallucinations*, with religious themes, specifically that there were demons in her head, she was God and Death, and she was able to see angels. Ms. Monahan also presented with *avolition* (a lack of motivation), which resulted in refusal of food and water, and minimal to no efforts at engagement with others.

6
7
8
9

*Id.* (emphasis in original). Dr. Sailey diagnosed Ms. Monahan as suffering from schizoaffective disorder, depressive type, and recommended that competency restoration treatment be provided, in addition to an order for involuntary medication because Ms. Monahan was consistently refusing her medications. *Id.*

10
11
12
13
14

On June 2, 2021, ARNP Paris reported that Ms. Monahan should be weighed twice a day for a month, but NaphCare records do not indicate whether this was done. *Id.* ¶ 6.24. NaphCare records indicate that Western State Hospital was not willing to participate, but Plaintiffs allege that there is no recorded evidence explaining why Ms. Monahan could not be transported for involuntary psychiatric treatment and care. *Id.*

15
16
17
18
19
20
21
22
23
24

Approximately one month before Ms. Monahan's death, Deputy Justin Shoemaker reported that Ms. Monahan's water had been turned off "due to flooding issues over the past three days." *Id.* ¶ 6.25. But when the water was turned back on, Ms. Monahan started throwing water under her door. *Id.* Her water was then turned off again and her floor was cleaned. *Id.* Ms. Monahan reportedly stated that she was frustrated about why she was flooding her room, and Deputy Shoemaker wrote that her mental health appeared to be deteriorating. *Id.* RN Biver noted that Ms. Monahan had abnormal vital signs and a 32.9 percent loss in weight. *Id.* ¶ 6.26. An alert was sent to the nurse's queue, but no action was taken by any NaphCare or Clark County Jail official. *Id.*

Director of Nursing (DON), Chanelle Hackney, reported that Ms. Monahan had lost 50 pounds since entering Clark County Jail, and she was moved to a camera cell on June 10, 2021. *Id.* ¶ 6.27. That day, Dr. Daniel Gorecki noted that currently custody did not have staffing to bring Ms. Monahan to the clinic "as she is a 2:1." *Id.* On June 15, 2021, LPN Sliss wrote that Ms. Monahan refused to come to medical for vital signs. *Id.* ¶ 6.28. Dr. Gorecki also reported she had not been eating consistently and had lost weight. *Id.* ¶ 6.29. He wrote, "[Ms. Monahan] is wondering why I am bothering her and denies any concerns or pains." *Id.* When he saw her, Ms. Monahan was "laying under a green smock" and when he tried to pull it back, she pulled it over her head while talking intermittently. *Id.* He also noted her lunch was untouched, but concluded that despite her mental health issues, there was no evidence that put Monahan physically in jeopardy. *Id.* Dr. Gorecki wrote that the plan was to put her in a camera room and continue monitoring her. *Id.*

On June 20, 2021, RN Arvydas Lapinskas reported that Ms. Monahan had not been eating for the past few days. *Id.* ¶ 6.30. He wrote that Clark County Deputies had removed several days' worth of food out of her cell. *Id.* ARNP Paris similarly observed officers finding unopened food containers under her bed and she noted Ms. Monahan had been refusing Gatorade and Boost for three days. *Id.* On June 21, 2021, DON Hackney recorded Ms. Monahan's weight with her smock on as 105 pounds. *Id.* ¶ 6.31. Ms. Monahan received an injection for Haldol and per DON Hackney's order, she received another injection the next day. *Id.* ¶ 6.32. Ms. Monahan continued to refuse meals and fluids. *Id.* DON Hackney indicated that based on her lab results, Ms. Monahan was likely to be an ER transport because of dehydration and that Jail Custody Staff had been notified. *Id.*

On June 22, 2021, ARNP Paris reported Ms. Monahan continuing to refuse food, thinking that it was poisoned, and that her weight was 105 pounds. *Id.* ¶ 6.33. Urine and blood

tests taken around this time showed Ms. Monahan had borderline high serum sodium, suggesting dehydration. *Id.* On June 23, 2021, LPN Tripp noted that Ms. Monahan was mostly sleeping, and when she offered Gatorade and tried to obtain vitals from her, she refused both and told LPN Tripp to "please just leave me alone." *Id.* ¶ 6.34.

Ms. Monahan was then transported to Peace Health SW where she was given intravenous fluid and electrolytes. *Id.* Blood tests taken at Peace Health SW showed that dehydration was no longer present. *Id.* Urine tests results taken at Clark County Jail and Peace Health SW revealed ketones, a finding that Plaintiffs allege are consistent with inadequate caloric intake. *Id.* Ms. Monahan was discharged from Peace Health SW and returned to the Clark County Jail with a recommendation for close psychiatric follow-up. *Id.*

On June 25, 2021, RN Kerri Taft noted that Ms. Monahan had a blood pressure of 98/73 and her weight loss was still nearly 30 percent down. *Id.* ¶ 6.35. Ms. Monahan was given Boost and Gatorade, but she continued refusing her breakfast. *Id.* A few days later, LPN Leanne Nething observed Ms. Monahan crying uncontrollably. *Id.* ¶ 6.36. Ms. Monahan refused injections of Benadryl and Haldol and asked for a different medication. *Id.*

On June 29, 2021, NaphCare employee, Kimberly Parker, wrote in a Daily Suicide Watch Progress Note that Ms. Monahan said that she was on suicide watch for not eating because she hurt herself. *Id.* ¶ 6.37. Parker added that Ms. Monahan had not demonstrated "a consistent pattern of taking care of herself" and that she was to be monitored for her safety. *Id.* Dr. Gorecki reported again that Ms. Monahan had lost 50 pounds since December 2020 as a result of not eating and had been taken to the emergency department. *Id.* DON Hackney also noted that Ms. Monahan was seen on camera dumping the contents of her Styrofoam container into the toilet. *Id.*

On June 30, 2021, Ms. Monahan was prescribed Thorazine, another antipsychotic medication, and restarted Seroquel. *Id.* ¶ 6.38. Ms. Monahan, however, continued not eating consistently and therefore could not be taken off suicide watch. *Id.* RN Biver noted that Ms. Monahan began pulling her emergency alarm and she was seen scooping water out of the sink and throwing it onto the floor under the door. *Id.* While a deputy was cleaning up the water, he heard Ms. Monahan say to other deputies, "why don't you just murder me like you do everyone else." *Id.*

3.    *Final days leading up to Ms. Monahan's death*

On July 2, 2021, Parker determined that Ms. Monahan should be released from suicide watch because she was eating and drinking Gatorade. *Id.* ¶ 6.40. Three days later, LPN Eastman noted that Ms. Monahan's room was messy with food found on the floor and fecal matter spread onto the door window. *Id.* ¶ 6.41. LPN Eastman, however, wrote that Ms. Monahan did not appear to be in any acute distress. *Id.* On July 6, 2021, Dr. Gorecki reported that her labs were unremarkable though Plaintiffs allege that the labs drawn on July 2, 2021 suggested she was dehydrated. *Id.* ¶ 6.42. Dr. Gorecki noted that they were still waiting on a Western State Mental Health Evaluation. *Id.*

On July 8, 2021 at 3:45AM, Ms. Monahan asked for Gatorade and a snack, complaining of chest pain. *Id.* ¶ 6.43. LPH Hunter examined her and reported that she was not in distress and that her vital signs were normal, though they were not recorded. *Id.* Ms. Monahan refused her medications for the rest of the day and there were no further progress notes or records monitoring her fluid and food intake that day. *Id.* On July 9, 2021, Ms. Monahan again refused her medications. LPN Eastman wrote three clinical notes, all completed between 8:05AM and 9:40AM. *Id.* ¶ 6.44. Two notes were medication refusal forms with the "Patient Refusal" and "Patient declined to sign acknowledgment of medication refusal" boxes checked. *Id.* The third

note was a segregation note containing the following narrative comment: "Pt seen during AM med pass. Pt was seen laying on mattress on floor, covered with blankets. Pt shook head when asked if she wanted medications. Pt in no acute distress." *Id.*

At 2:45AM on July 10, 2021, Deputy Mindy Rothenberger heard "loud snoring sounds" coming from Ms. Monahan's cell while performing the duty of "constant watch." *Id.* ¶ 6.45. Deputy Frazier looked into her cell and saw Ms. Monahan in an "unfamiliar position on the floor that appeared out of the ordinary." *Id.* Deputy Ian Frazier returned with medical staff—RN Clarke, LPN Hunter, and LPN Mainah. *Id.* Deputy Frazier also called for a second deputy and they both entered Ms. Monahan's cell and found her unresponsive. *Id.* Additional correctional officers including Deputy Winston, Deputy Grant, Deputy Grundhauser, Deputy Kirgiss, and Deputy Rebihic arrived at the scene. *Id.* They observed Ms. Monahan having a seizure. *Id.* Her pulse rate of 55 was slow and she was breathing heavily and making loud snoring noises, though her blood oxygen levels were normal. *Id.* Emergency Medical Services (EMS) was called and while waiting, Ms. Monahan's pulse jumped to 155–162. *Id.* It then disappeared. *Id.* RN Clarke started CPR and called for an Automated External Defibrillator (AED). *Id.* Plaintiffs allege that despite AEDs being standard equipment for jails, there was no documentation that an AED was produced or used before EMS arrived at 3:21AM with their own defibrillator. *Id.*

EMS tried to resuscitate Ms. Monahan but failed. *Id.* Ms. Monahan died in the Clark County Jail at 3:48AM on July 10, 2021. *Id.* The Clark County Medical Examiner performed the autopsy and concluded that Ms. Monahan had died of severe hyponatremia and hypochloremia due to water intoxication. *Id.* ¶ 6.46. The Medical Examiner also noted that Ms. Monahan had died due to probable psychogenic polydipsia. *Id.*

**B.      Procedural Background**

Plaintiffs filed this lawsuit on May 22, 2024. Dkt. 1. On July 3, 2024, NaphCare Defendants moved to dismiss or, alternatively, for a more definite statement. Dkt. 9. In their response, Plaintiffs requested leave to amend their complaint, Dkt. 17, which the Court granted, Dkt. 22.

On September 19, 2024, Plaintiffs filed an amended complaint, Dkt. 29, and NaphCare Defendants again moved to dismiss, Dkt. 32. Plaintiffs responded, Dkt. 37, and NaphCare Defendants replied, Dkt. 39. Clark County Defendants filed a response stating that they do not oppose Defendant NaphCare's motion and take no position on it. Dkt. 38. While the motion to dismiss was pending, NaphCare Defendants and Clark County Defendants moved to stay discovery. Dkt. 34. The Court denied the motion, concluding that a stay in discovery would prevent parties from developing evidence to support claims and defenses that would likely move forward. Dkt. 46 at 3.

### III.      DISCUSSION

**A.      Motion to Dismiss Legal Standard**

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) motions may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted).

To survive a Rule 12(b)(6) motion, the complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations omitted).

The Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party," *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014), but need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**B.    Western State Hospital and the Department of Social and Health Services are not required parties under Fed. R. Civ. P. 19.**

Defendants contend that "[a]t its core, this case is about an alleged failure to transport Monahan to Western State Hospital for involuntary psychiatric care and competency restoration after a court ordered that treatment. . . . It's the basis of Plaintiffs' entire theory of liability[.]" Dkt. 32 at 19. Thus, Defendants' argument goes as follows: since only Western State Hospital and the Washington Department of Social and Health Services (DSHS) can authorize

competency evaluations and restoration treatments in the state, those two entities are necessary parties under Rule 19. *Id.* at 18. But joinder of both entities is not feasible because Western State Hospital and DSHS are immune from suit under the Eleventh Amendment. *Id.* at 25; *see Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022). Therefore, because "the case cannot in equity and good conscience proceed without them," Defendants conclude that the entire case must be dismissed. *Id.* at 28.

This argument fails for several reasons. To start, Western State Hospital and DSHS are not required[2] parties because they are not necessary parties to this case. In determining whether a party is required, courts must determine: "(1) whether an absent party is necessary to the actions; and then (2) if the party is necessary, but cannot be joined, whether the party is indispensable such that in equity and good conscience the suit should be dismissed." *Roberts v. City of Fairbanks*, 947 F.3d 1191, 1204 (9th Cir. 2020) (quoting *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002)).

"A party may be necessary under Rule 19(a) in three different ways." *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012). "First, a person is necessary if, in his absence, the court cannot accord complete relief among existing parties. . . . Second, a person is necessary if he has an interest in the action and resolving the action in his absence may as a practical matter impair or impede his ability to protect that interest. . . . Third, a person is necessary if he has an interest in the action and resolving the action in his absence may leave an existing party subject to inconsistent obligations because of that interest." *Id.* (citations omitted).

---

[2] Following the 2007 stylistic amendments enacted, Fed. R. Civ. P. 19 no longer refers to "indispensable" parties, but instead uses the term "required party." *See Alto v. Black*, 738 F.3d 1111, 1118 (9th Cir. 2013).

1.    *The Court can accord complete relief to Plaintiffs.*

"In conducting the Rule 19(a)(1) analysis, the court asks whether the absence of the party would preclude the district court from fashioning meaningful relief as between the parties. . . . This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004) (citations omitted).

Defendants argue that the Court cannot accord complete relief among existing parties because "[n]either the Court nor a jury could resolve Plaintiffs' Fourteenth Amendment claims about failure to transport Monahan to Western State Hospital without the hospital's and Department's participation." Dkt. 32 at 23. But Defendants distort Plaintiffs' claims by presuming that the entire complaint is based on a single inaction—failing to transfer Ms. Monahan to Western State Hospital so that she could receive competency restoration services. *See id.* at 8. The complaint is clear that Plaintiffs seek damages from Defendants based on a series of events that they allege show Defendants did not provide Ms. Monahan with adequate medical care during her seven-month incarceration. *See* Dkt. 29 ¶¶ 1.1–13.4.

Here, Plaintiffs seek compensatory and punitive damages permitted under federal and state law against NaphCare and its individual employees. *See* Dkt. 29 at 39. The absence of Western State Hospital or DSHS does not preclude the Court from awarding the requested damages if Plaintiffs prevail on their claims. Complete relief may therefore be "accorded among those already parties." *See U.S. ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 908 (9th Cir. 1994) (quoting Fed. R. Civ. P. 19(a)(1)); *Roberts*, 947 F.3d at 1204 ("Plaintiffs may obtain complete relief through their § 1983 claims against the City of Fairbanks and its officers—the alleged perpetrators of the § 1983 violations—if their action is successful.").

2.      *Western State Hospital and DSHS do not have a legally protected interest in this case.*

"The purpose of Fed. R. Civ. P. 19(a)(2)(i) is to protect the legitimate interests of absent parties, as well as to discourage multiplicitous litigation." *Rose*, 34 F.3d at 908. "To come within the bounds of Rule 19(a)(1)(B)(i), the interest of the absent party must be a legally protected interest and not merely some stake in the outcome of the litigation." *Maverick Gaming LLC v. United States*, 123 F.4th 960, 972 (9th Cir. 2024) (citation omitted).

Defendants rely exclusively on the *Trueblood* litigation for their contention that Western State Hospital and DSHS have an interest in this case. *See* Dkt. 32 at 20–24. In *Trueblood*, the district court issued a permanent injunction ordering DSHS to provide timely competency services for pretrial detainees. 101 F. Supp. 3d 1010, 1024 (W.D. Wash. 2015), *modified*, No. C14-1178 MJP, 2015 WL 13664033 (W.D. Wash. May 6, 2015), and *modified*, No. C14-1178 MJP, 2016 WL 4533611 (W.D. Wash. Feb. 8, 2016), and *vacated and remanded*, 822 F.3d 1037 (9th Cir. 2016). Eight years later, the same court found that DSHS's continued failure to provide timely competency services to pretrial detainees violated their constitutional rights and ordered a series of actions to comply with its original injunction. *See A.B. by & through Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 681 F. Supp. 3d 1149, 1154 (W.D. Wash. 2023). DSHS appealed this order which is now pending before the Ninth Circuit. *See Trueblood v. Washington State Dep't of Soc. & Health Servs.*, Case No. 23-35534 (9th Cir.).

Defendants argue that Plaintiffs "ask this Court to resolve the same issues before the Ninth Circuit in *Trueblood*[.]" Dkt. 32 at 24. Defendants seek to conflate this action with the *Trueblood* litigation by reducing Plaintiffs' claims to the failure to provide Ms. Monahan with competency evaluations and restoration. *See* Dkt. 32 at 8 ("The gravamen of Plaintiff's Amended Complaint is that someone should have transferred Shelly Monahan from Clark County Jail to

Western State Hospital for involuntary psychiatric care and competency restoration treatment."). To be clear, the issues before the Ninth Circuit in *Trueblood* are not the same issues presented to this Court. Plaintiffs' claims do not hinge on the failure to provide timely competency restoration but are based on Defendants' broader failure to provide Ms. Monahan with appropriate medical treatment and their deliberate indifference to her needs. *See generally* Dkt. 29.

Apart from an interest in defending themselves from *Trueblood* liability, Defendants do not point to any legally protected interest that Western State Hospital or DSHS has in adjudicating whether NaphCare or Clark County's actions violated Ms. Monahan's constitutional rights. *See generally* Dkt. 32. And crucially, neither state entity has claimed any interest in this suit. *See In re Cnty. of Orange*, 262 F.3d 1014, 1023 (9th Cir. 2001) (citation omitted) ("Orange County cannot claim that the districts have a legally protected interest in the action unless the districts themselves claim that they have such an interest, and the districts have been silent."); *see also Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043–44 (9th Cir. 1983) (holding that the government was not "necessary" in part because it "has never asserted a formal interest in either the subject matter of this action or the action itself."). Since Western State Hospital and DSHS do not claim any interest in this action, the Rule 19(a)(1)(B) inquiry is unnecessary. *See Northrop Corp.*, 705 F.2d at 1043 (finding that joinder under Rule 19(a)(1)(B) is "contingent, however, upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action").

Nevertheless, Defendants claim, "[r]esolution without these entities would impair or impede their ability to protect that interest," and that there is a risk "this Court might hold that the County and NaphCare have obligations regarding competency restoration services that conflict with what the Ninth Circuit says about these services, subjecting the County and NaphCare to inconsistent and competing requirements." Dkt. 32 at 23–24. But this is not a case

seeking injunctive relief. Nothing the Court or a jury will decide in this case will subject the County or Naphcare to ongoing or future requirements. The task in this case will be to determine whether the Defendants' conduct violated federal and state law as it existed at the time of Ms. Monahan's incarceration and death. Resolving those questions does not raise any realistic possibility of conflicting with the *Trueblood* litigation or impairing the interests of the State of Washington. Defendants' argument on this point rests on a string of speculative inferences and a mischaracterization of Plaintiffs' complaint, untethered from Ninth Circuit precedent on Rule 19. Because Western State Hospital and DSHS are not necessary parties, the state entities are not "[p]ersons required to be joined if feasible." Fed. R. Civ. P. 19(a).

       3.    *Western State Hospital and DSHS are at most permissive parties.*

In *Temple v. Synthes Corporation*, the Supreme Court held, "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." 498 U.S. 5, 7 (1990) (collecting cases). "Nothing in the 1966 revision of Rule 19 changed that principle. . . . The Advisory Committee Notes to Rule 19(a) explicitly state that 'a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability.'" *Id.* (cleaned up).

Plaintiffs argue that *Temple* is binding caselaw. Dkt. 37 at 23–24. They also point to *Hurley v. Horizon Project, Inc.*, No. CV-08-1365-ST, 2009 WL 5511205, at *7 (D. Or. Dec. 3, 2009), report and recommendation adopted as modified, No. CV 08-1365-ST, 2010 WL 273806 (D. Or. Jan. 15, 2010). *Id.* at 24. There, the district court rejected an argument similar to the one asserted by Defendants. The plaintiff sued Horizon Project Inc., a group home operator, alleging that the defendant violated his substantive due process rights under Section 1983. *Hurley*, 2009 WL 5511205, at *1. The plaintiffs also sued Umatilla County and Jackson County and their employees for choosing to re-license Horizon Project Inc. despite deficiencies recorded in the

state inspectors report. *Id.* The county defendants moved to dismiss under Fed. R. Civ. P. 19, arguing that the State was a necessary party because "the state is liable for some or all of the injuries Hurley sustained while in the Horizon facility." *Id.* at *7. The district court denied the motion to dismiss, finding that there was no legally protected interest because the "State has disclaimed all interest in this action." *Id.* at *8. The district court further reasoned, "*Temple* [] applies to any liability that may exist under § 1983," and after applying *Temple*'s holding, it concluded that the State was merely a joint tortfeasor and thus not a necessary party. *Id.*

Here, as in *Temple* and *Hurley*, Defendants seek to dismiss the case for failure to join parties who are not necessary but are potential joint tortfeasors. *See* Dkt. 32 at 18–28. While Western State Hospital and DSHS may share some fault in Ms. Monahan's death, they need not be joined for the suit to proceed. *See Temple*, 498 U.S. at 8 ("As potential joint tortfeasors with Synthes, Dr. LaRocca and the hospital were merely permissive parties."). Defendants' motion to dismiss under Rule 19 is thus DENIED.

C.     **Section 1983 Claims**

Pretrial detainees have a constitutional right to adequate medical treatment. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). The constitutional right arises under the Due Process Clause of the Fourteenth Amendment since pretrial detainees "have not yet been convicted of a crime and therefore are not subject to punishment by the state." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979)). The Due Process Clause imposes a "duty to provide medical care [which] encompasses detainees' psychiatric needs." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (citations omitted).

To establish a claim for failure to provide constitutionally adequate medical care to a pretrial detainee, a plaintiff must show:

(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Sandoval*, 985 F.3d at 669 (quoting *Gordon I*, 888 F.3d at 1125) (alteration in original).

The third element is evaluated under an objective deliberate indifference standard, and "the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting *Gordon I*, 888 F.3d at 1125).

1.    *Personally participating NaphCare employees*

a)    RN Clarke

Defendant Clarke (RN Clarke) was a Registered Nurse employed by NaphCare during Ms. Monahan's incarceration at the Clark County Jail. Dkt. 29 ¶ 3.11. Plaintiffs allege that RN Clarke was working in the area near Ms. Monahan's cell on the morning of her death. *Id.* ¶ 6.45. RN Clarke, along with other NaphCare staff, observed Ms. Monahan lying unresponsive in her cell. *Id.* While waiting for EMS to arrive, RN Clarke started CPR and called for an AED, although Plaintiffs allege it was unclear whether an AED was produced or administered. *Id.* Based on these factual allegations, Plaintiffs argue that despite being "aware of Ms. Monahan's

excessive water consumption, unresponsiveness, and generally poor condition," RN Clarke "failed to facilitate treatment with a licensed provider[.]" Dkt. 37 at 14.

Plaintiffs have not alleged sufficient facts to support a medical care claim against RN Clarke. Specifically, Plaintiffs do not allege facts to show that RN Clarke was aware of a serious risk of harm to Ms. Monahan, that her actions reflected a reckless disregard of that risk, or that her actions caused Ms. Monahan's death. *See Sandoval*, 985 F.3d at 669. Plaintiffs only assert that, given RN Clarke's proximity to Ms. Monahan's cell the day she died, RN Clarke should have sought additional medical care. *See* Dkt. 29 ¶ 7.5(a); *Murphy v. Ricci*, No. 319CV06171RBLJRC, 2020 WL 4227816, at *2 (W.D. Wash. June 25, 2020), report and recommendation adopted, No. 319CV06171RBLJRC, 2020 WL 4226516 (W.D. Wash. July 23, 2020) ("Fatal to his claims, however, plaintiff does not explain how defendant Ricci made any intentional or reckless decision with respect to the conditions of plaintiff's confinement or that defendant Ricci's failure to act caused plaintiff any particular injury."). Therefore, Defendants' motion to dismiss is GRANTED as to RN Clarke.

b)    LPN Sliss

Defendant Sliss (LPN Sliss) was a Licensed Practical Nurse employed by NaphCare during Ms. Monahan's detention in the Clark County Jail. Dkt. 29 ¶ 3.18. Plaintiffs allege that on February 8 or 9, 2021, LPN Sliss reported that Ms. Monahan had abnormal vitals and was dehydrated. *Id.* ¶ 6.14. On May 29, 2021, LPN Sliss noted that Ms. Monahan was not on video camera so staff could not see what, if anything, she was consuming. *Id.* ¶ 6.22. On June 15, 2021, LPN Sliss noted that "Ms. Monahan refused to come to medical for vital signs and labs per Deputy Marsh." *Id.* ¶ 6.28. Plaintiffs assert that these allegations show that "LPN Sliss recklessly

failed to facilitate treatment and charted a sham-refusal[3] as an explanation for her inaction." *Id.*
¶ 7.5(h).

These facts are similarly insufficient to show that LPN Sliss was deliberately indifferent
to Ms. Monahan's serious medical need. *See Sandoval*, 985 F.3d at 669. Beyond two notes that
LPN Sliss recorded about Ms. Monahan's vitals and one note about being unable to see
Ms. Monahan on camera, Plaintiffs do not allege facts to show LPN Sliss made any intentional
or reckless decision that caused her death. *See Murphy*, 2020 WL 4227816, at *2. Defendants'
motion to dismiss is GRANTED as to LPN Sliss.

c)    RN Biver

Defendant Biver (RN Biver) was a Registered Nurse working for NaphCare during the
relevant period. Dkt. 29 ¶ 3.17. Plaintiffs allege that in February 2021, RN Biver witnessed
Ms. Monahan flooding her cell. *Id.* ¶ 6.12. RN Biver recorded this event, noting that
Ms. Monahan had a low body temperature, and was too cold and shivery to obtain vitals. *Id.* On
June 8, 2021, RN Biver noted that Ms. Monahan had abnormal vital signs/reading and logged a
32.9 percent weight loss. Plaintiffs allege an alert was sent to the nurse's queue, but no further
action was taken. *Id.* On June 30, 2021, RN Biver noted that Ms. Monahan began pulling her
emergency alarm, flooding her cell, and acting erratically. *Id.* ¶ 6.38.

Plaintiffs again have not pleaded sufficient facts to show that RN Biver's actions caused
Ms. Monahan's death. While the facts support that RN Biver was aware of Ms. Monahan's
declining health and that she was potentially negligent, the complaint does not sufficiently allege
how RN Biver's actions constituted reckless disregard for a substantial risk to Ms. Monahan's

---

[3] In the complaint, Plaintiffs define the practice of recording a denial of care by a patient who
does not have the mental capacity to engage with medical personnel as a "sham-refusal." Dkt. 29
at 2, n.1.

health. *See Wallace v. Pierce Cnty. Sheriff's Dep't*, No. 319CV05329RBLDWC, 2019 WL 5892809, at *3 (W.D. Wash. Nov. 12, 2019) ("Plaintiff fails to allege facts demonstrating a particular Defendant was aware of a substantial risk of harm yet deliberately ignored or failed to reasonably respond to the risk, causing Plaintiff harm."). Defendants' motion to dismiss is thus GRANTED as to RN Biver.

d)    <u>LPN Mainah</u>

Defendant Mainah (LPN Mainah) was a Licensed Practical Nurse employed by NaphCare during Ms. Monahan's detention at the Clark County Jail. Dkt. 29 ¶ 3.13. Plaintiffs allege that on December 25, 2020, LPN Mainah wrote in a segregation note that 22 days after her admission into the Clark County Jail that Ms. Monahan appeared disheveled, her room a mess, and that she was mute/uncooperative. *Id.* ¶ 6.8. She reported that Ms. Monahan was seen during morning medication rounds but did not respond when called. *Id.* On December 31, 2020, LPN Mainah offered Ms. Monahan her prescribed medication of Seroquel but she refused and was recorded as a refusal, and no further action was taken. *Id.* ¶ 6.10.

Apart from LPN Mainah's presence the morning of Ms. Monahan's death, LPN Mainah's alleged actions occurred in the first few weeks of Ms. Monahan's incarceration. *See* ¶¶ 6.8, 6.10. Though the allegations may show that LPN Mainah was aware of Ms. Monahan's mental health needs when she was first admitted, the facts do not demonstrate that LPN Mainah's failure to seek additional treatment during her incarceration was in reckless disregard of Ms. Monahan's health. For example, even though Plaintiffs assert that "LPN Mainah observed Ms. Monahan throughout her incarceration in obvious mental and physical distress," the allegations do not sufficiently show that LPN Mainah was aware of Ms. Monahan's severe decline in health. *Id.* ¶ 7.5(c). Defendants' motion to dismiss is therefore GRANTED as to LPN Mainah.

e)     LPN Pfau

Defendant Pfau (LPN Pfau) was a Licensed Practical Nurse employed by NaphCare during Ms. Monahan's incarceration at the Clark County Jail. *Id.* ¶ 3.15. Plaintiffs assert that on January 25, 2021, LPN Pfau noted that Ms. Monahan refused to provide a urine sample, refused medications, and was observed to be tearful under her blanket in the cell. *Id.* ¶ 6.11. Two days later, LPN Pfau noted that Ms. Monahan refused Seroquel and would not sign the acknowledgment of medication refusal. *Id.* LPN Pfau reported refusals to take medication on several occasions throughout late January and early February. *Id.* Plaintiffs assert that "LPN Pfau recklessly failed to facilitate treatment and charted a sham-refusal as an explanation for her inaction." *Id.* ¶ 7.5(e).

LPN Pfau's interactions with Ms. Monahan occurred early in her incarceration at the Clark County Jail and the reports of medical refusals are insufficient to plead that LPN Pfau was objectively indifferent to a serious medical need. While LPN Pfau "allegedly did not take all efforts necessary to care for [Ms. Monahan], the current allegations do not state a claim that [LPN Pfau] recklessly disregard[ed] her condition." *Burghart v. S. Corr. Entity*, No. C22-1248 TSZ, 2023 WL 1766258, at *4 (W.D. Wash. Feb. 3, 2023) (citations omitted) ("As currently pleaded, the operative complaint alleges medical negligence, but no more."). Accordingly, Defendants' motion to dismiss is GRANTED as to LPN Pfau.

f)     LPN Tripp

Defendant Tripp (LPN Tripp) was a Licensed Practical Nurse working for NaphCare during the relevant period. Dkt. 29 ¶ 3.16. In February 2021, LPN Tripp witnessed Ms. Monahan flooding her cell and dipping bloody water out of the toilet and pouring that water over her head. *Id.* ¶ 6.12. LPN Tripp noted that Ms. Monahan "is clearly not in her right mind" and had Ms. Monahan on a mental health list to be seen ASAP, but records are unclear whether she was

seen urgently. *Id.* On May 4, 2021, LPN Tripp noted that Ms. Monahan "has been off her rocker today and has been locked down all day." *Id.* ¶ 6.20. On June 23, 2021, LPN Tripp noted that Ms. Monahan was lying under her smock and that she offered Gatorade and tried to obtain vitals. Ms. Monahan refused both and told LPN Tripp, "[p]lease just leave me alone." *Id.* ¶ 6.34. Plaintiffs assert that LPN Tripp "recklessly failed to facilitate treatment and charted a sham-refusal as an explanation for inaction." *Id.* ¶ 7.5(f).

Plaintiffs again have not alleged sufficient facts to support a medical care claim against LPN Tripp. The allegations reflect three interactions between LPN Tripp and Ms. Monahan where she noted Ms. Monahan was exhibiting erratic behavior. *See id.* ¶¶ 6.12, 6.2, 6.34. But Plaintiffs' allegation that "LPN Tripp recklessly failed to facilitate treatment" is conclusory. *Id.* ¶ 7.5(f). It does not allege the specific risk of harm LPN Tripp was aware of, nor does it allege how her actions reflected a reckless disregard for that risk. *See Burghart*, 2023 WL 1766258, at *4 ("[T]he operative pleading does not allege that the Nurses engaged in conduct that was medically unacceptable under the circumstances in disregard of 'an excessive risk' to the Decedent's health.") (cleaned up). Defendants' motion to dismiss is thus GRANTED as to LPN Tripp.

g)    <u>LPN Hunter</u>

Defendant Hunter (LPN Hunter) was a Licensed Practical Nurse working for NaphCare during the relevant period. *Id.* ¶ 3.12. Plaintiffs allege that LPN Hunter worked near Ms. Monahan during the three days leading up to Ms. Monahan's death. *Id.* ¶ 6.45. Two days before her death, Ms. Monahan complained of chest pain and asked for Gatorade and a snack. *Id.* ¶ 6.43. LPN Hunter examined her and reported that Ms. Monahan was in no distress and her vital signs were reportedly normal although they were not recorded. *Id.* Plaintiffs allege that were no follow-up progress reports regarding Ms. Monahan's fluid or food intake that day. Dkt. 29

¶ 6.43. LPN Hunter was also present the morning of Ms. Monahan's death and Plaintiffs assert that LPN Hunter failure to seek additional treatment constituted reckless disregard of a substantial risk of harm to Ms. Monahan. *Id.* ¶¶ 6.45, 7.5(c).

Plaintiffs have adequately alleged the elements of deliberate indifference to a serious medical need against LPN Hunter. The complaint alleges that as part of the medical staff, LPN Hunter had authority to make decisions regarding Ms. Monahan's healthcare. *Id.* ¶ 3.12. Responding to Ms. Monahan's complaints of chest pain, LPN Hunter made the intentional decision not to escalate the concern and conclude that she was not in distress, despite Ms. Monahan's deterioration over the preceding months. *See id.* ¶ 6.43. Plaintiffs allege that LPN Hunter's decision not to raise Ms. Monahan's complaints of chest pain with other medical staff and failing to follow up with her food or fluid intake two days before her death put Ms. Monahan at substantial risk of harm. *Id.* ¶ 6.43. Plaintiffs assert that LPN Hunter appreciated this risk because she examined Ms. Monahan the day of her death and she was "visibly ill, not eating, excessively consuming water, only partially responsive." *Id.* ¶ 7.5(b). Finally, the complaint alleges that by failing to implement reasonable available measures such as raising concerns in her notes or seeking additional treatment, LPN Hunter caused Ms. Monahan's injuries. *Id.* ¶¶ 7.5(b), 12.5.

Plaintiffs plausibly allege that LPN Hunter's choice not to bring attention to Ms. Monahan's condition despite having examined her twice in the two days leading up to her death was objectively unreasonable under the circumstances. *See Est. of Silva v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL 6946011, at *7–8 (S.D. Cal. Nov. 25, 2020) (finding that the Estate had sufficiently alleged that Jail nurse's failure to arrange a medical or psychiatric evaluation or place the decedent in a sobering cell for monitoring despite the

decedent's history of schizophrenia violated the decedent's due process rights). Accordingly, Defendants' motion to dismiss is DENIED as to LPN Hunter.

a) <u>LPN Eastman</u>

Defendant Eastman (LPN Eastman) was a Licensed Practical Nurse employed by NaphCare during Ms. Monahan's detention at the Clark County Jail. Dkt. 29 ¶ 3.19. Plaintiffs allege that in the days leading up to Ms. Monahan's death, LPN Eastman was aware she "was not on her medication, nonresponsive, and visibly ill." *Id.* ¶ 7.5(i). Specifically, Plaintiffs assert that on July 1, 2021, LPN Eastman wrote that Ms. Monahan was still refusing her medications. *Id.* ¶ 6.39. Four days later, LPN Eastman noted that Ms. Monahan's room was messy and food was found on the floor with fecal matter spread onto the door window. *Id.* ¶ 6.41. Despite documenting this behavior and noting Ms. Monahan's refusal of Boost/Gatorade, LPN Eastman wrote that Ms. Monahan did not appear to be in any acute distress. *Id.* One day before Ms. Monahan's death, LPN Eastman wrote three clinical notes. *Id.* ¶ 6.44. Two notes indicated Ms. Monahan's medication refusals and one note included a comment that Ms. Monahan was seen laying on a mattress on the floor, covered in blankets. *Id.* When asked if she wanted medications, Ms. Monahan shook her head and LPN Eastman noted that she was not in acute distress. *Id.*

Plaintiffs sufficiently allege that LPN Eastman violated Ms. Monahan's constitutional right to adequate medical care. The complaint asserts that as part of NaphCare staff, LPN Eastman could make decisions about Ms. Monahan's care and decided not to raise concerns about Ms. Monahan's condition though she exhibited signs of mental and physical decline. *Id.* ¶¶ 3.19, 6.41. Plaintiffs allege that despite Ms. Monahan's bizarre behavior of spreading fecal matter onto the door window, and her continued refusal of medication, food, and Gatorade, LPN Eastman made the decision not to monitor her more closely or consider transporting her to a

facility for urgent psychiatric or medical treatment. *Id.* ¶ 6.41. LPN Eastman noted that Ms. Monahan was not in acute distress and this decision, made a few days before her death, placed Ms. Monahan at substantial risk of harm to her health. This is a risk that a reasonable LPN would have appreciated based on her behavior, weight loss, and rejection of medication. *Id.* ¶ 7.5(i). The complaint alleges that by failing to escalate Ms. Monahan's health issues or arrange treatment, LPN Eastman caused Ms. Monahan's death. *Id.* ¶¶ 7.5(i), 12.5.

Plaintiffs plausibly allege that LPN Eastman's failure to escalate Ms. Monahan's psychiatric needs or to seek treatment for her was objectively unreasonable under the circumstances. *See Regal v. Cnty. of Santa Clara*, No. 22-CV-04321-BLF, 2023 WL 7194879, at *6 (N.D. Cal. Oct. 31, 2023) (finding that Plaintiffs had plausibly alleged that the jail therapist's failure to take reasonable available measures to abate the substantial risk of suicide constituted deliberate indifference to the decedent's serious medical need). Defendants' motion to dismiss is DENIED as to LPN Eastman.

a)    <u>ARNP Paris</u>

Defendant Paris (ARNP Paris) was an Advanced Registered Nurse Practitioner employed by NaphCare during the period of Ms. Monahan's incarceration. Dkt. 29 ¶ 3.14. Although Plaintiffs assert that ARNP Paris exercised "supervisory authority over numerous nurses," since the allegations center on ARNP Paris's personal participation in Ms. Monahan's care, the Court evaluates the claims accordingly. *See id.* ¶ 7.5(d).

The Court finds that Plaintiffs have adequately alleged a medical care claim against ARNP Paris. First, Plaintiffs allege that ARNP Paris had supervisory authority over other nurses and had the authority to make decisions regarding Ms. Monahan's medical care such as prescribing medication and placing her on suicide watch. *Id.* ¶¶ 6.9, 7.5(d).

Second, Plaintiffs allege ARNP Paris's decision not to seek treatment and monitoring required for Ms. Monahan's physical and mental health needs placed Ms. Monahan at a substantial risk of harm. *Id.* ¶ 7.5(d). The harm here is dying from metabolic disorders caused by self-harming behavior such as water intoxication. *Id.* ¶ 6.46.

Third, Plaintiffs assert that ARNP failed to take reasonable measures to reduce the risk of harm. For example, when Ms. Monahan refused her medications, ARNP Paris noted the refusal but did not seek other ways to medicate her despite knowing her history of schizophrenia and generalized anxiety disorder based on her own psychiatric evaluation of Ms. Monahan. *Id.* ¶¶ 6.9, 6.18. In addition, after observing Ms. Monahan had lost 29 pounds and was "floridly psychotic," ARNP Paris required that Ms. Monahan be weighed twice a day for a month, which was not done. *Id.* ¶¶ 6.19, 6.24. ARNP Paris noted that Ms. Monahan was consistently refusing food thinking her food was poisoned. *Id.* ¶ 6.33. Even though urine and blood tests taken revealed borderline high serum sodium, suggesting dehydration, ARNP Paris did not provide treatment and monitoring. *Id.* ¶ 7.5(d). Plaintiffs allege that a reasonable official would have appreciated these risks, and ARNP Paris's failure to properly monitor and treat Ms. Monahan caused her hyponatremia and hypochloremia and ultimate death. *Id.* ¶ 6.47.

Plaintiffs have pleaded sufficient facts to show that ARNP Paris made an intentional decision about Ms. Monahan's medical care causing a risk of substantial harm to her, and ARNP Paris failed to take measures to mitigate such risk even though a reasonable ARNP would have done so. *See TAMARIO SMITH, et al., Plaintiffs, v. SANTA CRUZ COUNTY, et al., Defendants. Additional Party Names: Cnty. of Santa Cruz, Felicia Smith, Gerald Lazar, James Hart, Michael Warren-Smith, Wellpath, LLC,* No. 5:21-CV-00421-EJD, 2023 WL 8360054, at *4 (N.D. Cal. Dec. 1, 2023) ("Plaintiffs have plead facts to show that Lazar had actual knowledge of Smith's severe schizophrenia, inability to monitor his own conditions, and worsening mental health based

on his own interview with Smith, which the Court finds sufficient at this stage to show that a reasonable official in those circumstances would have appreciated the high degree of risk involved."). Therefore, Defendants' motion to dismiss is DENIED as to ARNP Paris.

### 2.   Supervisory NaphCare employees

Section 1983 does not authorize liability under the theory of *respondeat superior*. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207(9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

"The requisite causal connection" exists where the supervisor "sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms," *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009) (citation omitted), or "knowingly refus[es] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury," *Starr*, 652 F.3d at 1207–08 (citation omitted). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

1

2

a)    <u>DON Hackney</u>

Defendant Hackney (DON Hackney) was the NaphCare Director of Nursing and served

3

as interim Health Services Administrator during Ms. Monahan's detention at the Clark County

4

Jail. Dkt. 29 ¶¶ 3.20, 6.37. Plaintiffs allege that DON Hackney supervised numerous nurses who

5

"failed to provide medication or facilitate treatment after charting sham-refusals as explanations

6

for their inaction," and by not taking any action, DON Hackney acquiesced to the nurses'

7

unconstitutional conduct. *Id.* ¶ 7.5(j).

8

Plaintiffs' allegations plausibly show that Don Hackney knew of the constitutional

9

violations and failed to act to prevent them. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.

10

1989) (citation omitted) ("A supervisor is only liable for constitutional violations of his

11

subordinates if the supervisor participated in or directed the violations, or knew of the violations

12

and failed to act to prevent them."). Plaintiffs allege DON Hackney was aware of

13

Ms. Monahan's refusal to eat her meals and take fluids, personally observing Ms. Monahan's 50-

14

pound weight loss during her detention. *Id.* ¶¶ 6.27, 6.31. Plaintiffs also allege DON Hackney

15

had access to records documenting Ms. Monahan's mental health history and was on notice of

16

Ms. Monahan's medication "refusals" recorded in clinical notes. *Id.* ¶¶ 6.1, 6.2, 7.5(j). In other

17

words, DON Hackney knew that Ms. Monahan was not taking her medications and that they

18

were being documented as "refusals" by subordinate nurses but failed to take any action. *See id.*

19

Plaintiffs further allege that two weeks before Ms. Monahan's death, DON Hackney was aware

20

of her declining health, noting that based on Ms. Monahan's lab results, she would likely be

21

taken to the ER for dehydration. *Id.* ¶ 6.32. Even though DON Hackney ordered an injection of

22

Haldol, no changes to Ms. Monahan's treatment were made when she returned to the Clark

23

County Jail after being provided intravenous fluid and electrolytes at Peace Health SW. *Id.*

24

¶¶ 6.32, 6.34, 6.37.

These allegations are sufficient to allege supervisory liability and Defendants' motion to dismiss is DENIED as to DON Hackney.

b)    <u>Dr. Gorecki</u>

Defendant Gorecki (Dr. Gorecki) was a Medical Doctor employed by NaphCare *Id.* ¶ 3.21. He supervised NaphCare nurses and "observed Ms. Monahan throughout the course of her incarceration." *Id.* ¶ 7.5(k). The complaint alleges that like DON Hackney, Dr. Gorecki oversaw numerous nurses "who failed to provide medication or facilitate treatment after charting sham-refusals as explanations for their inaction," and through his inactions, Dr. Gorecki acquiesced to the nurses' unconstitutional conduct. *Id.* Plaintiffs also allege that Dr. Gorecki personally participated in the constitutional deprivation by failing to appropriately respond to obvious symptoms of decline such as Ms. Monahan's weight loss and test results "consistent with developing metabolic disorders." *Id.*

Plaintiffs' complaint sufficiently alleges supervisory liability based on personal participation. First, Plaintiffs assert that as the medical doctor, Dr. Gorecki had the authority to make decisions regarding Ms. Monahan's healthcare, which he did by reviewing the results of her labs drawn eight days before her death and concluding that they were unremarkable. *See id.* ¶ 6.42. Second, Plaintiffs allege Dr. Gorecki knew that Ms. Monahan's consistent refusal of medication, food, and water posed a substantial risk to her health. *Id.* ¶¶ 6.29, 6.37. Even though Dr. Gorecki concluded that Ms. Monahan's labs were normal, Plaintiffs assert that the labs were "consistent with developing metabolic disorders." *Id.* ¶ 7.5(k). Third, Plaintiffs allege Dr. Gorecki failed to take reasonable measures to mitigate this risk, such as transferring Ms. Monahan to Western State Hospital to receive the court ordered competency restoration services or to any other hospital for treatment. *Id.* ¶ 6.27. Finally, Plaintiffs assert Dr. Gorecki's failure to obtain appropriate treatment for Ms. Monahan caused her death. *Id.* ¶¶ 6.47, 7.5(j).

Plaintiffs also sufficiently allege supervisory liability based on Dr. Gorecki's knowledge of the nurses' constitutional violations and failure to act to prevent them. *See Taylor*, 880 F.2d at 1045. The complaint asserts that Dr. Gorecki knew of Ms. Monahan's psychiatric needs, noting that the plan was to put Ms. Monahan in a room with camera to continue monitoring her. *Id.* ¶ 6.27. And though Dr. Gorecki was aware of notes documenting Ms. Monahan's medication "refusals," *see id.* ¶ 7.5(k), as well as her refusal to eat or drink, *see id.* ¶ 6.29, Plaintiffs allege he did not act to facilitate treatment, *see id.* ¶ 6.42.

Since these allegations adequately state claim for supervisory liability, Defendants' motion to dismiss is DENIED as to Dr. Gorecki.

## D.    *Monell* Liability

Section 1983 does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Yet a municipal entity can be liable under Section 1983 for violating constitutional rights if a plaintiff shows the entity had a policy or custom of violating or acting with deliberate indifference to the plaintiff's rights. *See id.* at 690–91 (1978); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). The plaintiff must show that: (1) a constitutional violation occurred and (2) municipal policy or custom was a "moving force" behind the violation. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). This includes "both causation-in-fact and proximate causation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008)). A private entity such as NaphCare may similarly be held liable under Section 1983 for acts committed under the color of state law. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).

     1.     *Practice or custom*

Plaintiffs bring a *Monell* claim against Defendants under one of three recognized theories of *Monell* liability: longstanding practice or custom. *See* Dkt. 29 ¶¶ 8.1–8.10; *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021) (*Gordon II*). Unlike an express policy, a longstanding practice or custom "need not be formal or written to create municipal liability under Section 1983[.]" *Gordon II,* 6 F.4th at 974*.* But "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (citing *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.). "While one or two incidents are insufficient to establish a custom or policy" . . . "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794–95 (9th Cir. 2017) (holding that a custom of deliberate indifference to a prisoner's serious medical need could be inferred from the defendant's repeated delay of medical care to the single plaintiff).

Plaintiffs allege NaphCare had three practices that caused Ms. Monahan's constitutional injury: (1) a custom of logging sham-refusals in lieu of providing care to patients with mental health problems; (2) a custom of improperly monitoring and evaluating inmates; and (3) a custom of failing to escalate treatment of serious medical conditions to a qualified medical provider. Dkt. 29 ¶ 8.5.

Defendants respond that "Plaintiffs do not plead a pattern of prior similar violations of which NaphCare policymakers at Clark County Jail knew or should have known." Dkt. 32 at 33. Plaintiffs, Defendants argue, point to violations that occurred in jails where NaphCare operated, but Defendants maintain that these incidents are unrelated because they happened in other jails and a few years before or after Ms. Monahan's death. *Id.* Defendants conclude, "[w]ithout

allegations of notice . . . that any omission or inaction would likely result in a constitutional injury to [Ms.] Monahan . . . Plaintiffs' *Monell* claim against NaphCare fails." *Id.* This argument is unpersuasive.[4]

First, Plaintiffs allege several instances of NaphCare employees recording sham-refusals in this case when Ms. Monahan refused medication despite her inability to appreciate the consequences of her actions. *See* Dkt 29 ¶¶ 7.5(b), (c), (e), (f), (g), (h), (i), (j); *Oyenik*, 696 F. App'x at 794. Plaintiffs also point to other incidents that plausibly show that the practice of sham-refusals occurs with "sufficient duration, frequency, and consistency." *Gordon II*, F.4th at 974. For example, Plaintiffs allege in 2015, Jamycheal Mitchell died under NaphCare's care. Mitchell suffered from mental health illnesses, did not eat, and died from medical complications related to starvation. Dkt. 29 ¶ 8.4(d). Plaintiffs allege that NaphCare used Jamycheal Mitchell's "refusal" to engage with medical personnel as a reason to ignore him. *Id.* Plaintiffs also assert that a 2017 NCCHC Resources, Inc. audit of the Washoe County Jail in Nevada identified numerous problems with the way NaphCare conducted intake assessments for medical and mental health issues. Dkt. 29 ¶ 8.4(a). The audit noted that several inmates in need of mental health care were not assessed because they were deemed "refusals." *Id.* Plaintiffs further allege in 2023, at the Pierce County Jail, Javier Tapia suffered an infection from a blood clot that reduced blood flow to his leg, ultimately requiring amputation. *Id.* ¶ 8.4(f). NaphCare claimed that Javier Tapia "refused" to engage in treatment when Tapia could not communicate due to

---

[4] NaphCare is an Alabama corporation registered to do business in the State of Washington. Dkt. 29 ¶ 3.10. Given its operations across many states, the Court finds it unlikely that NaphCare would lack notice of allegations brought against it, especially in high-profile lawsuits. *See Est. of Hill by & through Grube v. NaphCare, Inc.*, No. 2:20-CV-00410-MKD, 2023 WL 6297483 (E.D. Wash. Sept. 27, 2023).

being gravely ill. *Id.* Plaintiffs thus adequately allege that NaphCare had a custom of logging sham-refusals when medical treatment was needed.

Second, Plaintiffs provide examples of NaphCare employees improperly monitoring and evaluating inmates in their interactions with Ms. Monahan. Plaintiffs allege that ARNP Paris and Dr. Gorecki noted that Ms. Monahan needed to be weighed twice a day and monitored in a video cell, but they assert that Ms. Monahan was not properly watched, resulting in her excessive water consumption and death. *See id.* ¶¶ 6.24, 6.29. A month before Ms. Monahan died, RN Biver noted that Ms. Monahan had abnormal vitals and had lost 32.9 percent of her weight, but no actions were taken. *Id.* ¶ 6.26.

In addition to NaphCare's treatment of Ms. Monahan, Plaintiffs allege that in 2017, NaphCare did not complete the intake screening or create a treatment plan for an inmate suffering from severe psychological and medical issues. *Id.* ¶ 8.4(b). NaphCare instead placed her in a cell and waited under she became cooperative. *Id.* Plaintiffs assert NaphCare justified their inaction on "lack of cooperation" and NaphCare MHP Jessica Lothrop described what happened as being "stuck in booking" and that "it wasn't unusual." *Id.* ¶ 8.4(b). These facts mirror Plaintiffs' allegations that NaphCare has a practice of failing to properly monitor and evaluate inmates who are at risk of harm. *See Dawson v. S. Corr. Entity*, No. C19-1987RSM, 2021 WL 4244202, at *6 (W.D. Wash. Sept. 17, 2021) (denying NaphCare's motion for summary judgment as to the *Monell* claim that "NaphCare's custom of not screening mentally ill inmates or providing them with treatments plans is what enabled the inactions of NaphCare's nurses and MHPs"). At this stage, these allegations are sufficient to plead that NaphCare had a custom of improperly monitoring and evaluating detainees.

Lastly, Plaintiffs' complaint is replete with allegations that NaphCare staff failed to escalate treatment of serious medical conditions Ms. Monahan was experiencing. *See* Dkt. 29

¶¶ 6.1–7.7. Plaintiffs also point to prior incidents of NaphCare's failure to escalate. *See id.* ¶¶ 8.4(c), (e). Plaintiffs allege that in 2015, under NaphCare's care, Matthew Smith died from sepsis caused by complications from Crohn's disease because he was not taken to a hospital for seven hours. *Id.* ¶ 8.4(c). Plaintiffs also allege that in 2018, a jury awarded $24 million in punitive damages against NaphCare after Cindy Hill, a pretrial detainee, died from complications from a ruptured intestine because she was not timely transported to a hospital. *Id.* ¶ 8.4(e); *see Est. of Hill by & through Grube v. NaphCare, Inc.*, 2023 WL 6297483, at *11 (denying NaphCare's motion for a judgment as a matter of law and motion for a new trial because "the jury was presented evidence sufficient to conclude that NaphCare's custom of sending patients in need of medical monitoring to medical watch, or, as NaphCare suggests, leaving them in their original cells, created a substantial risk that those patients would die from their illnesses"). The allegations presented adequately show that NaphCare had a practice of not escalating treatment of serious medical needs.

### 2. Causation

There must be a "direct causal link" between NaphCare's practice or custom and Ms. Monahan's constitutional injuries to assert liability under Section 1983. *Sandoval*, 985 F.3d at 681 (quoting *Castro*, 833 F.3d at 1075). Here, all three of NaphCare's alleged customs—use of sham-refusals, improper monitoring and evaluation of detainees, and failure to escalate treatment of serious medical issues—caused Ms. Monahan to be denied the medical care she needed. *See Est. of Hill by & through Grube*, 2023 WL 6297483, at *11. Plaintiffs have thus adequately pleaded facts to show that the alleged customs caused Ms. Monahan's untimely death.

**E.      State Law Claims**

Defendants have not moved to dismiss the state law negligence and medical malpractice claims brought under Washington State's wrongful death statute, *see* RCW 4.20.010. Therefore, these claims will move forward.

**F.      Leave to Amend**

Plaintiffs request that if the Court finds that they did not properly state any of their claims, the Court grant leave to amend under Fed. R. Civ. P. 15(a). Dkt. 37 at 32.

"Leave to amend shall be freely given when justice so requires, and this policy is to be applied with extreme liberality." *Bacon v. Woodward*, 104 F.4th 744, 753 (9th Cir. 2024) (quoting *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014)). The Ninth Circuit has repeatedly held that "[e]ven if a complaint is deficient . . . 'a district court should grant leave to amend *even if no request to amend the pleading was made*, unless it determines that the pleading could not be cured by the allegation of other facts.'" *Id.* (quoting *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)) (emphasis in original).

Plaintiffs have already been granted leave to amend their complaint once. *See* Dkt. 22. Still, because it remains possible that the pleading could be cured by the allegation of other facts, the Court grants Plaintiffs leave to amend the complaint within 21 days after filing of this order. In their request for leave to amend, Plaintiffs claim they have been denied access to jail video recordings that would enable them to develop more detailed allegations. If Plaintiffs need more time to amend their complaint, they must file a motion for an extension of the 21-day period. If a discovery dispute is preventing the case from moving forward on schedule, Plaintiffs should bring that to the Court by following the undersigned judge's chambers procedures for the resolution of discovery disputes.

1

## IV.    CONCLUSION

2

For the foregoing reasons, the Court ORDERS as follows:

3

- Defendants' motion to dismiss all claims under Fed. R. Civ. P. 19 is DENIED.

4

- Defendants' motion to dismiss Section 1983 claims against LPN Clarke, LPN

5

  Mainah, LPN Pfau, LPN Tripp, RN Biver, and LPN Sliss is GRANTED. These

6

  claims are dismissed without prejudice and with leave to amend.

7

- Defendants' motion to dismiss Section 1983 claims against LPN Hunter, ARNP

8

  Paris, LPN Eastman, DON Hackney, and Dr. Gorecki is DENIED.

9

- Defendants' motion to dismiss Section 1983 claims against NaphCare, Inc. is

10

  DENIED.

11

- Defendants' motion to dismiss the claim for deprivation of familial relationship is

12

  GRANTED. This dismissal is without prejudice for Plaintiff Keith Monahan and

13

  with prejudice for the other plaintiffs.

14

15

Dated this 31st day of January, 2025.

16

17

Tiffany M. Cartwright
United States District Judge

18

19

20

21

22

23

24